IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Larry Krasner, in his official capacity : 
as the District Attorney of :
Philadelphia, :
              Petitioner :
  :
     v. : No. 563 M.D. 2022
  :
Senator Kim Ward, in her official :
capacity as Interim President Pro :
Tempore of the Senate; :
Representative Timothy R. Bonner, :
in his official capacity as an :
impeachment manager; :
Representative Craig Williams, in :
his official capacity as an :
impeachment manager; :
Representative Jared Solomon, in :
his official capacity as an :
impeachment manager; and :
John Does, in their official capacities :
as members of the Senate :
Impeachment Committee, :
              Respondents : Argued: December 29, 2022

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                      FILED: January 12, 2023

      Petitioner Larry Krasner, in his official capacity as the District Attorney of

Philadelphia (District Attorney), has filed a Petition for Review in the Nature of a

Complaint for Declaratory Judgment (PFR) in this Court's original jurisdiction.

Through this PFR, Krasner seeks a judicial declaration against Respondents Senator Kim Ward, in her official capacity as Interim President Pro Tempore of the Senate (Interim President);[1] Representatives Timothy R. Bonner, Craig Williams, Jared Solomon, and John Does, in their official capacities as members of the Senate Impeachment Committee (collectively, Respondents), that the impeachment proceeding against him, which is currently pending in the General Assembly, is unlawful and unconstitutional. Respondents Representatives Timothy R. Bonner, and Craig Williams, in their official capacities as impeachment managers (collectively, Impeachment Managers), have filed preliminary objections to the PFR.[2] Additionally, Interim President has filed a Cross-Application for Summary Relief (Cross-Application).[3] Finally, Proposed Intervenor Senator Jay Costa, in his official capacity (Proposed Intervenor), has filed an Application for Leave to Intervene (Intervention Application).

After thorough review, we grant Proposed Intervenor's Intervention Application, overrule Impeachment Managers' preliminary objections in full, grant District Attorney's Application for Summary Relief in part and deny it in part, and grant Interim President's Cross-Application in part and deny it in part.

## I. Facts and Procedural History

On November 16, 2022, the Pennsylvania House of Representatives (House) passed House Resolution 240 (HR 240), which contained amended articles of

---

[1] Interim President was elected President Pro Tempore of the Senate on January 3, 2023.

[2] The other impeachment manager, Representative Jared Solomon, in his official capacity as an impeachment manager, filed a notice of non-participation in this action.

[3] Interim President's Cross-Application comes after her initial filing of an answer with new matter.

impeachment (Amended Articles) against District Attorney, by a vote of 107 to 85. The Amended Articles provide the following bases for impeaching District Attorney:

> **Article I:** Misbehavior in Office In the Nature of Dereliction of Duty and Refusal to Enforce the Law
>
> **Article II:** Misbehavior in Office In the Nature of Obstruction of House Select Committee Investigation
>
> **Article III:** Misbehavior in Office In the Nature of Violation of the Rules of Professional Conduct and Code of Judicial Conduct; specifically Rule 3.3 Candor Toward the Tribunal, Rule 8.4 Professional Misconduct, and Canon 2 of the Code of Judicial Conduct Impropriety and Appearance of Impropriety in the Matter of *Robert Wharton v. Donald T. Vaughn*
>
> **Article IV:** Misbehavior in Office In the Nature of Violation of the Rules of Professional Conduct; specifically Rule 3.3 Candor Toward the Tribunal, Rule 8.4 Professional Misconduct, and Canon 2 of the Code of Judicial Conduct Impropriety and Appearance of Impropriety in the Matter of *Commonwealth v. Pownall*
>
> **Article V:** Misbehavior in Office In the Nature of Violation of the Rules of Professional Conduct and Code of Judicial Conduct; specifically Rule 3.3 Candor to Tribunal, Rule 8.4 Professional Misconduct, and Canon 2 of the Code of Judicial Conduct Impropriety and Appearance of Impropriety in the matter *In re: Conflicts of Interest of Philadelphia District Attorney's Office*
>
> **Article VI:** Misbehavior in Office in Nature of Violation of Victims [sic] Rights
>
> **Article VII:** Misbehavior in Office in the Nature of Violation of the Constitution of Pennsylvania By Usurpation of the Legislative Function

PFR, Ex. C. On November 29, 2022, the Pennsylvania State Senate (Senate) passed Senate Resolution 386 (SR 386), which established "special rules of practice and procedure in the Senate when sitting on impeachment trials[,]" and Senate

3

Resolution 387 (SR 387), which directed the House to "exhibit" the Amended Articles through its designated impeachment managers before the Senate on November 30, 2022.

On November 30, 2022, the Senate enacted Senate Resolution 388 (SR 388), which ordered that a writ of impeachment summons be issued to District Attorney and set the start date of his impeachment trial as January 18, 2023. The 206th General Assembly, which was responsible for passing all of the aforementioned resolutions, terminated at 11:59 p.m. on November 30, 2022, and was replaced by the 207th General Assembly. *See* Pa. Const. art. II, §§ 2-4. The Senate's summons was then served upon District Attorney on December 1, 2022.

On December 2, 2022, District Attorney filed his PFR with this Court. Therein, he requested judgment against Respondents that would declare the pending impeachment proceedings to be unconstitutional and unlawful. The PFR contains three counts, each of which offers a separate argument for why District Attorney is entitled to such relief. In Count I, District Attorney argues that the Amended Articles, as a pending matter, were rendered void upon the termination of the 206th General Assembly on November 30, 2022, and did not carry over to the 207th General Assembly. PFR ¶¶41-50. In Count II, he claims that he cannot be impeached and removed by the General Assembly, because the Pennsylvania Constitution does not give the General Assembly power to impeach local elected officials, as well as because the power to do so has been delegated to the City of Philadelphia's government. *Id.* ¶¶52-61. Finally, in Count III, he argues that the Amended Articles are invalid and do not provide a constitutionally valid basis for his impeachment, as none of them assert viable claims that District Attorney engaged in "any misbehavior in office." *Id.* ¶¶63-79. Accordingly, District Attorney has asked this Court to:

4

(A) Declare that the Amended Articles and related legislative business, including [SR] 386, 387, and 388, became null and void on November 30, 2022, upon the adjournment *sine die* of the 206th General Assembly legislative session.

(B) Declare that [a]rticle VI, [s]ection 6 of the Pennsylvania Constitution[4] does not authorize impeachment of . . . [District Attorney] by the General Assembly.

(C) Declare that the Amended Articles against . . . [District Attorney] do not allege conduct that constitutes "any misbehavior in office" within the meaning of [a]rticle VI, [s]ection 6 of the Pennsylvania Constitution.

(D) Declare that [] Respondents have no authority to take up the Amended Articles and any such efforts would be unlawful.

(E) Declare that any effort by [] Respondents, House[,] or Senate to take up the Amended Articles or related legislation, including [SR] 386, 387, or 388, is unlawful.

(F) Grant such other relief as is just and proper.

PFR, Prayer for Relief. Contemporaneously, District Attorney also filed an Application for Summary Relief, in which he argues that he is entitled to summary relief on each of the three counts in the PFR.

Both Impeachment Managers and Interim President have filed challenges to the PFR. In their preliminary objections, Impeachment Managers argue that this

---

[4] Article VI, section 6 of the Pennsylvania Constitution reads as follows:

The Governor and all other civil officers shall be liable to impeachment for any misbehavior in office, but judgment in such cases shall not extend further than to removal from office and disqualification to hold any office of trust or profit under this Commonwealth. The person accused, whether convicted or acquitted, shall nevertheless be liable to indictment, trial, judgment and punishment according to law.

Pa. Const. art. VI, § 6.

Court should dismiss the PFR for several reasons. First, Counts I and III present non-justiciable political questions, as it is exclusively within the General Assembly's purview to decide whether impeachment proceedings can continue into a new iteration of the General Assembly, as well as whether District Attorney's behavior constitutes "any misbehavior in office." Impeachment Managers' Br. in Support of Prelim. Objs. at 10-17. Second, District Attorney lacks standing to challenge the impeachment proceedings, as he is not aggrieved by the impeachment proceedings, which have yet to take place. *Id.* at 18-20. Finally, Counts II and III are not yet ripe for judicial review, as District Attorney is not entitled to preemptive judicial determinations regarding whether someone in his elected office is subject to impeachment and removal by the General Assembly, or whether the impeachment charges against him are sufficient. *Id.* at 20-25. As for Interim President, she argues in her Cross-Application that this Court lacks subject matter jurisdiction because District Attorney has failed to join the Senate and the Senate Impeachment Committee, both of which Interim President alleges are indispensable parties, as well as because District Attorney has allegedly failed to state claims that are legally sufficient and ripe for judicial review. Interim President's Br. at 16-82.

## *II. Discussion*

## A. Indispensable Parties

We first address Interim President's assertion that District Attorney has failed to join all indispensable parties, specifically the Senate and Senate Impeachment Committee, as this argument implicates this Court's jurisdiction to consider the merits of District Attorney's PFR. On this point, Interim President's argument is without merit.

> [The Supreme] Court has stated that a party is indispensable "when his or her rights are so connected

6

with the claims of the litigants that no decree can be made without impairing those rights." *Sprague v. Casey*, . . . 550 A.2d 184, 189 ([Pa.] 1988). "[T]he basic inquiry in determining whether a party is indispensable concerns whether justice can be done in the absence of" him or her. *CRY, Inc. v. Mill Serv., Inc.*, . . . 640 A.2d 372, 375 ([Pa.] 1994). In undertaking this inquiry, the nature of the claim and the relief sought must be considered. *See id.* at . . . 375-76.[11] Furthermore, we note the general principle that, in an action for declaratory judgment, all persons having an interest that would be affected by the declaratory relief sought ordinarily must be made parties to the action. *See Mains v. Fulton*, . . . 224 A.2d 195, 196 ([Pa.] 1966). Indeed, Section 7540(a) of the Judicial Code, 42 Pa. C.S. § 7540(a), which is part of Pennsylvania's Declaratory Judgments Act,[12] states that, "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding."

> [11] The relevant analysis is sometimes said to require examination of the following factors: "1. Do absent parties have a right or interest related to the claim? 2. If so, what is the nature of that right or interest? 3. Is that right or interest essential to the merits of the issue? 4. Can justice be afforded without violating the due process rights of absent parties?" *Mechanicsburg Area Sch. Dist. v. Kline*, . . . 431 A.2d 953, 956 ([Pa.] 1981). These are implicitly considered in the analysis that follows.
>
> [12] [42 Pa. C.S. §§ 7531-7541].

While this joinder provision is mandatory, it is subject to limiting principles. For example, where the interest involved is indirect or incidental, joinder may not be required.

*City of Phila. v. Com.*, 838 A.2d 566, 581-82 (Pa. 2003). "The failure to join an indispensable party to a lawsuit deprives the court of subject matter jurisdiction. Whether a court lacks jurisdiction due to the failure to join an indispensable party

7

may be raised at any time or *sua sponte*." *HYK Constr. Co. v. Smithfield Twp.*, 8 A.3d 1009, 1015 (Pa. Cmwlth. 2010) (internal citations omitted).

Interim President argues that the Court lacks subject matter jurisdiction because District Attorney did not name the entire Senate as a respondent, as well as because the Senate Impeachment Committee (Committee), though an allegedly indispensable party, does not exist yet and cannot be represented, as District Attorney attempts to do, by naming John Does as respondents in the actual Committee's stead. Interim President's Br. at 75-82.

At first blush, it would appear that Interim President is correct that the Senate is an indispensable party. The Senate's ability as a body to vote upon the Amended Articles would be affected, as a declaratory judgment in District Attorney's favor would certainly render pointless its pursuit of an impeachment trial, and the Senate undoubtedly has an interest in protecting its prerogative to run an impeachment trial as it sees fit.

However, upon further review, it is clear that the Senate is, in fact, dispensable. In *City of Philadelphia v. Commonwealth*, the Supreme Court was faced with a similar question regarding indispensable parties in litigation about whether certain legislation had been enacted in accordance with the Pennsylvania Constitution's procedural requirements. In its analysis, the Supreme Court noted that

> the guiding inquiry in any discussion of indispensability is whether justice can be done in the absence of the parties asserted to be necessary. Such an inquiry entails an assessment of the particular facts and circumstances presented in each case. Here, while it is true that the [challenged legislation] purports to alter the rights and obligations of numerous persons, due to the nature of the constitutional issues raised in the [City of Philadelphia's] Complaint, achieving justice is not dependent upon the participation of all of those persons.

*City of Phila.*, 838 A.2d at 584-85. Using this standard, the Court concluded that the General Assembly was not an indispensable party, remarking that

> it bears noting that this case is somewhat unusual in that the crux of the challenge centers, not upon any substantive aspect of the legislation at issue, but upon the procedure by which it was adopted. It could reasonably be argued, then, that the Legislature's participation is necessary, as it has a general interest in defending the procedural regularity of the bills that it approves. [*H*]*owever, the Presiding Officers and the Minority Leaders of both Houses of the General Assembly are* [*already*] *named respondents; these officials are capable of representing the interests of the Legislature as a whole.*

*Id.* at 584 (emphasis added). The same is true here. While the Senate certainly has a vested interest in the outcome of this matter, Interim President is already named as a respondent. Interim President's interest in this matter is *indistinguishable* from that of the Senate as a whole, and her involvement here has positioned her to also defend and protect the Senate's interests. In fact, the arguments and responses she has presented thus far all relate to the Senate's institutional impeachment-related powers, not to her specific authority as the Senate's president *pro tempore*. Therefore, the Senate's due process rights will not be violated if this Court proceeds with dealing with the merits of this case without its direct involvement, and, thus, it is not an indispensable party.

We reach the same conclusion as to the Committee. Preliminarily, it does not yet exist, so it obviously cannot defend itself at this point and does not seem like it is actually a proper party to name as a respondent.[5] However, like the Senate as a whole, the Committee, in the event that it is eventually constituted, would have interests in this matter that are coterminous with both that of the Senate and of

---

[5] Of course, that also presents a problem for Interim President; how can she plausibly argue that a party both does not exist and yet is indispensable to the litigation?

Interim President. As such, there is no basis for concluding that those interests could not be adequately protected by Interim President in her role as an already-named respondent in this case. Thus, the Committee is also not an indispensable party.[6] Consequently, as District Attorney was not required to name the Committee or the Senate as respondents to this matter, we deny Interim President's Cross-Application as to her assertion that we lack subject matter jurisdiction due to District Attorney's failure to join all indispensable parties.

## B. Impeachment Managers' Preliminary Objections

Moving on, as noted *supra*, Impeachment Managers preliminarily object to District Attorney's PFR on the following bases. First, they argue that Counts I and III present non-justiciable political questions, as it is exclusively within the General Assembly's purview to decide whether impeachment proceedings can continue into a new iteration of the General Assembly, as well as whether District Attorney's behavior constitutes "any misbehavior in office." Impeachment Managers' Br. in Support of Prelim. Objs. at 10-17. Second, they claim that District Attorney lacks standing to challenge the impeachment proceedings, as he is not aggrieved by the impeachment proceedings, which have yet to take place. *Id.* at 18-20. Finally, they maintain Counts II and III are not yet ripe for judicial review, as District Attorney is not entitled to preemptive judicial determinations regarding whether someone in his elected office is subject to impeachment and removal by the General Assembly, or whether the impeachment charges against him are sufficient. *Id.* at 20-25. Each of these arguments will be addressed *seriatim*.

---

[6] Even so, we elect to dismiss the Committee as a party to this action, because "[n]o final judgment may be entered against a defendant designated by a Doe designation." Pa. R.Civ.P. 2005(g).

10

## 1. Do District Attorney's Claims Present Non-Justiciable Political Questions?

Contrary to Impeachment Managers' assertions, each of District Attorney's claims is fully justiciable and do not contravene the separation of powers doctrine.

> Ordinarily, the exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers. *See*, *e. g., Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). There may be certain powers which our Constitution confers upon the legislative branch, however, which are not subject to judicial review.

> A challenge to the Legislature's exercise of a power which the Constitution commits exclusively to the Legislature presents a nonjusticiable "political question."

> . . . .

> A political question stands in contrast to the ordinary respect which courts pay to the other branches of government. A political question is not involved when a court concludes that another branch acted within the power conferred upon it by the Constitution:

>> "In such cases . . . the court does not refuse judicial review; it exercises it. It is not dismissing an issue as non[-]justiciable; it adjudicates. It is not refusing to pass upon the power of the political branches; it passes upon it, only to affirm that they had the power which had been challenged and that nothing in the Constitution prohibited the particular exercise of it."

> Henkin, Is There a "Political Question" Doctrine?, 85 Yale L.J. 597, 606 (1976).

> In cases involving political questions, however, the courts will not review the actions of another branch because the determination whether the action taken is within the power granted by the Constitution has been "entrusted exclusively and finally to the political branches of government for 'self-monitoring.'" *Id.* at 599 (footnote omitted).

11

*Sweeney v. Tucker*, 375 A.2d 698, 705-06 (Pa. 1977). With regard to the impeachment process,

> [t]he [Pennsylvania C]onstitution provides . . . that "[t]he House . . . shall have the sole power of impeachment." [Pa. Const. art. VI, § 4.] This plain language makes the power plenary within constitutional limits[.] . . . Therefore, the courts have no jurisdiction in impeachment proceedings, and no control over their conduct, *so long as actions taken are within constitutional lines.*

*In re Investigation by Dauph. Cnty. Grand Jury, Sept., 1938*, 2 A.2d 802, 803 (Pa. 1938) (emphasis added). Thus, determining the *constitutionality* of an impeachment proceeding is something that falls squarely within the scope of judicial authority, but anything beyond that rests within the sole purview of the General Assembly.

Here, each of District Attorney's claims is rooted in allegations that the impeachment proceedings violate the strictures imposed by the Pennsylvania Constitution regarding who can be impeached and removed, as well as why and when eligible individuals can be impeached and removed. These are all non-political questions and are therefore justiciable. *See generally Sweeney*, 375 A.2d at 711 ("[T]he Pennsylvania Constitution should be construed, when possible, to permit state court review of legislative action alleged to be unconstitutional."); *cf.* 42 Pa. C.S. § 7541(a) ("[The Declaratory Judgments Act] is declared to be remedial. Its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered.").[7] Accordingly, we overrule Impeachment Managers' preliminary objection regarding the justiciability of District Attorney's claims.

---

[7] We note that, in *Larsen v. Senate of Pennsylvania*, our Court declined to declare claims relating to pending impeachment matters non-justiciable, but recognized

**(Footnote continued on next page…)**

that [the impeachment] process is committed by the Constitution to the Senate of Pennsylvania to an extent which clearly bars the courts from intervening with prior restraint. Impeachment involves an adjudicative process, but one which has been clearly set apart by the Constitution as distinguished from adjudications by the judicial branch of government, regardless of whatever powers the courts may have to interpret actions of the legislative body, by way of review, after they have been taken.

646 A.2d 694, 700, 705 (Pa. Cmwlth. 1994).

It appears that District Attorney has crafted his PFR to comply with the holding of *Larsen,* as he only seeks declaratory judgment in his favor, *but not injunctive relief*. Indeed, *Larsen* does not bar his action because of the nature of declaratory judgment actions.

A declaratory judgment declares the rights, status, and other legal relations "whether or not further relief is or could be claimed." 42 Pa. C.S. § 7532.[] It has been observed that "[d]eclaratory judgments are nothing more than judicial searchlights, switched on at the behest of a litigant to illuminate an existing legal right, status or other relation." *Doe v. Johns-Manville Corp*[.], . . . 471 A.2d 1252, 1254 ([Pa. Super.] 1984). Stated otherwise, "[t]he purpose of awarding declaratory relief is to finally settle and make certain the rights or legal status of parties." *Geisinger Clinic v. Di Cuccio*, . . . 606 A.2d 509, 519 ([Pa. Super.] 1992)[.]

A declaratory judgment, unlike an injunction, does not order a party to act. This is so because "the distinctive characteristic of the declaratory judgment is that the declaration stands by itself; that is to say, no executory process follows as of course." *Petition of Kariher*, . . . 131 A. 265, 268 ([Pa.] 1925).

*Eagleview Corp. Ctr. Ass'n v. Citadel Fed. Credit Union*, 150 A.3d 1024, 1029-30 (Pa. Cmwlth. 2016) (footnote omitted). A declaratory judgment in District Attorney's favor would not stop the Senate from conducting his impeachment trial, and would not act as a prior restraint, a fact which District Attorney appears to acknowledge in his PFR. *See* PFR ¶¶38-39 ("Declaratory relief, not injunctive relief, should be sufficient because . . . [District Attorney] trusts that Respondents will not take action inconsistent with a [declaratory judgment of the nature sought by District Attorney]. . . . Notwithstanding this, if Respondents take action inconsistent with any such declarations, . . . [District Attorney] reserves all rights to promptly file the necessary pleadings to obtain emergency injunctive relief.").

## 2. Does District Attorney Have Standing and Are His Claims Ripe?

Impeachment Managers' assertions that District Attorney lacks standing to pursue this matter and that his claims are not yet ripe for judicial review are also without merit.

> To have standing to seek judicial relief, the plaintiff must show that it is aggrieved by the action or matter that it challenges. A [petitioner] is aggrieved only if it is adversely affected and has a substantial, direct and immediate interest in the matter at issue. To be "substantial," the [petitioner's] interest must be distinct from and surpass the interest of all citizens in procuring compliance with the law. For the interest to be "direct," there must be a causal connection between harm to the [petitioner's] interest and the alleged violation of law that is the subject of the action. The interest is "immediate" if the causal connection is not remote or speculative.

*Ams. for Fair Treatment, Inc. v. Phila. Fed'n of Teachers*, 150 A.3d 528, 533 (Pa. Cmwlth. 2016) (internal citations omitted).

> There is considerable overlap between the doctrines of standing and ripeness, especially where the contentions regarding lack of justiciability are focused on arguments that the interest asserted by the petitioner is speculative, not concrete, or would require the court to offer an advisory opinion. *Rendell* [*v. Pa. State Ethics Comm'n*, 983 A.2d 708,] 718 [(Pa. 2009)]. In this sense, a challenge that a petitioner's interest in the outcome of the litigation is hypothetical may be pled either as determinative of standing or restyled as a ripeness concern although the allegations are essentially the same. *Id.* Standing and ripeness are distinct concepts insofar as ripeness also reflects the separate concern that relevant facts are not sufficiently developed to permit judicial resolution of the dispute. [However, p]ure questions of law . . . do not suffer generally from development defects and are particularly well suited for pre-enforcement review. *Id.* at 718 n.13.

*Robinson Twp., Wash. Cnty. v. Com.*, 83 A.3d 901, 917 (Pa. 2013).

It is entirely unreasonable under the circumstances for Impeachment Managers to assert that District Attorney lacks standing. The Amended Articles are targeted squarely at him and are part of the broader, continuing effort by the General Assembly to potentially remove him from office. If left to proceed unabated, the Amended Articles will result in the District Attorney being tried by the Senate in less than a month. This gives him a substantial, direct, and immediate interest in the outcome here, which renders him aggrieved, despite the fact that his impeachment trial has not yet begun. *Cf. Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 488-89 (Pa. 2021) (noting that "our jurisprudence in pre-enforcement declaratory judgment cases . . . has developed to give standing to plaintiffs to challenge laws before the laws have been enforced against them and before enforcement has been threatened").

As for the ripeness of District Attorney's claims, we acknowledge that Sections 4, 6, 10, and 15 of SR 386 collectively create a process through which he may make motions and objections regarding procedural and evidentiary issues prior to and during the course of his trial. *See* PFR, Ex. D. Even so, it remains that each of District Attorney's claims presents threshold questions of law and constitutional interpretation that require no additional factual development. We therefore conclude that the entirety of District Attorney's PFR is currently ripe for adjudication. *See Robinson*, 83 A.3d at 917.

Accordingly, we overrule Impeachment Managers' preliminary objections regarding District Attorney's standing and the ripeness of the claims articulated in his PFR.

## C. Interim President's Response in Opposition to District Attorney's Application for Summary Relief and Interim President's Cross-Application

Interim President opposes District Attorney's Application for Summary Relief, arguing that he is not entitled to judgment regarding any of the claims in his PFR. Interim President's Br. at 16-74.[8] She also seeks summary relief through her Cross-Application. Specifically, she maintains that each of District Attorney's claims is legally insufficient, as well as that Count III is not ripe for judicial review. *Id.* at 16-74, 82.[9] As a result, she contends she is entitled to summary relief in her favor on all counts.

### 1. Are District Attorney's Claims Ripe for Judicial Review?

As already discussed, each of District Attorney's claims presents threshold questions of law and constitutional interpretation that require no additional factual

---

[8] Applications for summary relief addressed to this Court's original or appellate jurisdiction are authorized under Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, [Pa.R.A.P. 1532(b),] which provides: "At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment *if the right of the applicant thereto is clear*." (Emphasis added.)

Summary relief is similar to summary judgment under the Pennsylvania Rules of Civil Procedure, in that the requested relief is only appropriate where there are no disputed issues of material fact and it is clear that the applicant is entitled to the requested relief under the law. *See Scarnati v. Wolf*, . . . 173 A.3d 1110, 1118 ([Pa.] 2017). Moreover, we review the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of disputed material facts against the moving party. *Id.*

*Marcellus Shale Coal. v. Dep't of Env't Prot.*, 216 A.3d 448, 458 (Pa. Cmwlth. 2019).

[9] Interim President also argues in her Cross-Application that this Court lacks subject matter jurisdiction, and that she is consequently entitled to summary relief on all counts, because both the Senate of Pennsylvania and the Senate Impeachment Committee are indispensable parties. Interim President's Br. at 75-82. This Court has already addressed the merits of this argument *supra* and declines to do so a second time here.

16

development. Therefore, we deny Interim President's Cross-Application regarding the ripeness of the claims presented by District Attorney.

<u>2. Are District Attorney's Claims Legally Insufficient?</u>

Interim President's assertion that District Attorney's claims are legally insufficient is best understood as a request for summary relief in her favor regarding the substantive merits of those claims. Traditionally, legal insufficiency of a pleading, otherwise known as demurrer, must be raised by preliminary objection. Per Pennsylvania Rule of Civil Procedure 1028, in relevant part:

> Preliminary objections may be filed by any party to any pleading and are limited to the following grounds:
>
> . . . .
>
> (4) legal insufficiency of a pleading (demurrer)[.]

Pa. R.Civ.P. 1028(a)(4). Where a party fails to demur to a pleading via preliminary objections, they waive their ability to do so. *See* Pa. R.Civ.P. 1032(a); *Zappala v. Brandolini Prop. Mgmt., Inc.*, 909 A.2d 1272, 1282 (Pa. 2006).

Here, Interim President argues that District Attorney's claims are legally insufficient, but this seems to be more of an improper use of legal terminology than an actual demurrer claim. Instead, judging by her Cross-Application, it appears that Interim President contends that District Attorney's claims are "legally insufficient," in that his reading of the Pennsylvania Constitution is incorrect and that, based upon the law and the factual circumstances, Interim President is entitled to judgment in her favor on all counts. For analytical simplicity's sake, the merits of Interim President's request for summary relief regarding the substance of District Attorney's claims is addressed in the following section.

17

## D. District Attorney's Application for Summary Relief

We now turn to the substantive merits of District Attorney's PFR, as well as his and Interim President's respective, dueling claims that they are entitled to summary relief in their favor. Each of the counts in District Attorney's PFR, generally speaking, requires us to parse the text of the Pennsylvania Constitution. Given this, we turn to our canons of constitutional interpretation for guidance.

> As an interpretive matter, the polestar of constitutional analysis undertaken by the Court must be the plain language of the constitutional provisions at issue. A constitutional provision requires unstrained analysis, "a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter." *Jubelirer v. Rendell*, . . . 953 A.2d 514, 528 ([Pa.] 2008); *Com*[.] *ex rel. Paulinski v. Isaac*, . . . 397 A.2d 760, 766 ([Pa.] 1979). Stated otherwise, the constitutional language controls and "must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Stilp v. Com*[.], . . . 905 A.2d 918, 939 ([Pa.] 2006); *Ieropoli v. AC&S Corp.*, . . . 842 A.2d 919, 925 ([Pa.] 2004).

*In re Bruno*, 101 A.3d 635, 659 (Pa. 2014). With this in mind, we turn to each of District Attorney's claims.

### 1. Have the Amended Articles Been Invalidated as a Result of the 206th General Assembly's Adjournment?

In Count I of his PFR, District Attorney claims that the Amended Articles were rendered null and void when the 206th General Assembly terminated on November 30, 2022, just prior to the stroke of midnight. District Attorney's Br. at 8-16. He claims that his position is backed by the Pennsylvania Constitution, the Legislative Procedure Manual (Manual), the General Assembly's Rules, and

precedential case law, and that he is entitled to summary relief as a result. *Id.* We, however, disagree.

The Pennsylvania Constitution establishes, in relevant part: "Members of the General Assembly shall be chosen at the general election every second year. Their term of service shall begin on the first day of December next after their election." Pa. Const. art. II, § 2. "Senators shall be elected for the term of four years and Representatives for the term of two years." *Id.* § 3. "The General Assembly shall be a continuing body during the term for which its Representatives are elected." *Id.* § 4. In line with these constitutional provisions, the Manual states:

> (a) *When held.*--The General Assembly is a continuing body during the term for which its Representatives are elected which begins on December 1 of each even-numbered year and ends at the expiration of November 30 of the next even-numbered year. Regular sessions are held annually and begin at 12 noon on the first Tuesday of January of each year. The regular session held in odd-numbered years is referred to as the first regular session and the regular session held in even-numbered years is referred to as the second regular session.
>
> (b) *Matters considered.*--There is no limitation as to the matters which may be considered during a regular session. All matters pending before the General Assembly upon the adjournment *sine die*[10] or expiration of a first regular session maintain their status and are pending before the second regular session.

101 Pa. Code § 7.21. "When the General Assembly finally adjourns any regular or special session, such adjournment is referred to as an adjournment *sine die* and is

---

[10] "The term '*sine die*' means 'without day,' and a legislative body adjourns *sine die* when it adjourns 'without appointing a day on which to appear or assemble again.'" *Creamer v. Twelve Common Pleas Judges*, 281 A.2d 57, 65 (Pa. 1971) (quoting *State ex rel. Jones v. Atterbury*, 300 S.W.2d 806, 811 (Mo. 1957)). The Senate's Rules pertaining to the 206th General Assembly are available here: https://www.pasen.gov/rules.cfm (last visited Jan. 12, 2023). It does not appear that the Senate has issued rules regarding the 207th General Assembly.

19

accomplished by a concurrent resolution." *Id.* § 7.24(b). Additionally, Senate Rule 12(j) mandates:

> All bills, joint resolutions, resolutions, concurrent resolutions or other matters pending before the Senate upon the recess of a first regular session convening in an odd-numbered year shall maintain their status and be pending before a second regular session convening in an even-numbered year but not beyond adjournment *sine die* or November 30th of such year, whichever first occurs.

S.R. 12(j), 206th General Assembly Senate Rule 12(j) (Pa. 2021-2022).[11] As the Supreme Court has explained:

> The [Pennsylvania] Constitution contemplates the exercise of legislative power by concurrence of both House and Senate. The legislative action of the General Assembly, in virtue of the session which convened, . . . end[s] with its adjournment.[] . . . There is no implied power in the exercise of which the [General Assembly] may sit after adjournment.

*Brown v. Brancato*, 184 A. 89, 93 (Pa. 1936) (footnote omitted).

> A motion to adjourn *sine die* has the effect of closing the session and terminating all unfinished business before the House, and all legislation pending upon adjournment sine die expires with the session, while a motion to adjourn from day to day does not destroy the continuity of a session and unfinished business simply takes its place on the calendar of the succeeding day.

*Frame v. Sutherland*, 327 A.2d 623, 627 n.9 (Pa. 1974) (quoting P. Mason, Manual of Legislative Procedure § 445(3), at 301 (1970)). "[A] *sine die* adjournment at the end of a session does not terminate all then-pending business before the General Assembly, however, as article II, section 4 of the Pennsylvania Constitution "now

---

[11] District Attorney also references House Rule 45(A), H.B. 243, 206th General Assembly, Pa. Rule 45(A) (Pa. 2021-2022), which pertains to the House's Government Oversight Committee, *see* District Attorney's Br. at 13, but that provision is irrelevant because the impeachment matter has already been passed from the House to the Senate.

provides that '[t]he General Assembly shall be a continuing body during the term for which its Representatives are elected.'" *Id.* Additionally, though it is not precedential, the following, succinct bit of analysis from *Commonwealth v. Costello* is instructive:

> When . . . the session of the legislature has finally adjourned and ended, . . . this is equivalent to the prorogation of parliament. The functions of the legislature are then terminated. The conclusion of the session puts an end to all pending proceedings of a legislative character: Jefferson's Manual, 183; Cushing's Law and Practice of Legislative Assemblies, § 516. Nothing thereafter remains to call into action any auxiliary legislative power.

21 Pa. D. 232, 237 (Pa. Quar. Sess. 1912), 1912 WL 3913, at *6.

All of this having been said, however, the General Assembly's *impeachment* powers are not the same as its *legislative* powers. To the contrary, those impeachment powers are found in

> a separate[] and independent article [of the Pennsylvania Constitution], standing alone and entirely unconnected with any other subject. Nor does [that article] contain any reference to any other provision of the [C]onstitution as being needed or to be used in carrying out the particular work to which the eighteenth article is devoted. It is a system entirely complete in itself; requiring no extraneous aid, either in matters of detail or of general scope, to its effectual execution.

*Com. ex rel. Att'y Gen. v. Griest*, 46 A. 505, 506 (Pa. 1900);[12] *accord Mellow v. Pizzingrilli*, 800 A.2d 350, 359 (Pa. Cmwlth. 2002) (Article III of the Pennsylvania Constitution is inapplicable to the constitutional amendment process, because "it is

---

[12] *Griest* addressed the question of whether constitutional amendments had to be approved by the Governor, to which the Supreme Court answered that "such submission is not only not required, but cannot be permitted[,]" because the constitutional amendment process is established through a different article of the Pennsylvania Constitution that is entirely separate from the one which established the process by which legislation is enacted into law. 46 A. at 507.

not a legislative act at all, but a separate and specific power granted to the General Assembly, similar to the impeachment and trial powers granted to the House . . . and Senate, respectively, under [a]rticle VI, [s]ections 4 and 5"). Instead, the General Assembly's constitutionally conferred power to impeach, try, and remove public officials "is a judicial power." *People ex rel. Robin v. Hayes*, 143 N.Y.S. 325, 327 (N.Y. Sup. Ct. 1913).

> [T]he sole function of the House and Senate is not to compose "the Legislature," and to act together in the making of laws. Each, in the plainest language, is given separate plenary power and jurisdiction in relation to matters of impeachment: The House the power to 'impeach,' that is, to prefer charges; the Senate the power to 'try' those charges. These powers are essentially judicial in their nature. Their proper exercise does not, in the remotest degree, involve any legislative function.

*Ferguson v. Maddox*, 263 S.W. 888, 890 (Tex. 1924).

The restrictions imposed by the Pennsylvania Constitution upon the General Assembly's legislative powers therefore do not apply to its judicial powers of impeachment, trial, and removal. While there is nothing explicit or specific in the Pennsylvania Constitution that addresses either the temporal limits of such judicial powers, in general, or the effect the termination of one iteration of the General Assembly and the beginning of a new one, Impeachment Managers and Interim President present persuasive authority, in the form of references to British history, to compendiums of parliamentary authority, to a nearly 110-year-old opinion from the Pennsylvania Attorney General, and to a litany of prior impeachment proceedings at the federal level, as well as in Pennsylvania and other states. *See* Impeachment Managers' Br. in Opp'n to District Attorney's Appl. for Summ. Relief at 9-15; Interim President's Br. at 25-33. All of that historical, judicial, and traditional authority firmly supports a conclusion that the Pennsylvania Constitution

does not require the impeachment and trial of a public official to be completed by the same iteration of the General Assembly. As the Florida Supreme Court wrote more than 150 years ago, when faced with a similar argument,

> [s]o long as there is a Senate there is a court. If the Senate was abolished and the impeachment causes then pending before it [were] not transferred to some other tribunal as its successor for trial, then we would have a different question for solution. But that is not the case. Because Senators may die or change, the Senate does not cease to exist nor do its functions as a court cease. The court co-exists with the Senate. Because the Judge of a Circuit Court may die, the Circuit Court does not cease to exist as a tribunal known to the constitution. A court is one thing, and the judge of the court is another. The abolition of the court does not follow from a vacancy in the office of the judicial officer that presides in it; the death of each officer composing this court, between the regular terms appointed for its sitting, would not a work a discontinuance of any cause now upon its calendar. If such a thing should occur in term, it would intercept and interrupt the actual business until other officers are appointed under the constitution; this would be the whole result. So far, therefore, as the tribunal is concerned, the Senate, like any other judicial tribunal, does not die or cease to exist with the adjournment of the session or term. Its business as a court is simply intercepted. All cases of impeachment pending and undisposed of at the preceding session remain upon its calendar or docket *until the Senate sitting as a court* enters an order finally disposing of each case. Much embarrassment in the consideration of this subject will arise if we make the Senate occupy to this matter the relation of a party, and conceive the idea that if the personal character of the Senate changes, the suit thereby is abated.

*In re Opinion of Justs.*, 14 Fla. 289, 297-98 (1872) (emphasis in original).[13] Therefore, as the adjournment of the General Assembly does not affect its judicial powers, we conclude that the Amended Articles remain constitutionally valid, despite the fact that District Attorney's impeachment was started during the 206th General Assembly and will be continued by the 207th. Accordingly, we deny District Attorney's Application for Summary Relief, and grant Interim President's Cross-Application, regarding Count I of the PFR.

## 2. Is District Attorney Constitutionally Eligible for Impeachment and Trial by the General Assembly?

In Count II, District Attorney argues that he cannot be impeached and removed by the General Assembly, due to his role as Philadelphia's district attorney. He puts forth two reasons for why this is the case. First, he argues that he is not a "civil officer," as that term is understood through its use in article VI, section 6 of the Pennsylvania Constitution. District Attorney's Br. at 17-21. Second, he maintains that all power to impeach and remove him has been constitutionally delegated to the City of Philadelphia's government. *Id.* at 21-26. On these bases, he maintains that he is entitled to summary relief regarding Count II. As with his argument regarding Count I, we disagree.

With regard to the first part of this argument, and as already mentioned *supra*, article VI, section 6 reads as follows:

---

[13] While Senate Rule 12(j), quoted *supra*, does expressly state that "[a]ll . . . other matters" shall not remain pending "beyond adjournment *sine die* or November 30th of such year, whichever first occurs[,]" the Senate's violation of its own internal procedural rules would not in this instance give this Court the ability to rule in District Attorney's favor regarding Count I. *Cf. Zemprelli v. Daniels*, 436 A.2d 1165, 1170 (Pa. 1981) ("Unquestionably the Senate has exclusive power over its internal affairs and proceedings. However, this power does not give the Senate the right to usurp the judiciary's function as ultimate interpreter of the Constitution under the guise of rulemaking, or for that matter, to make rules violative of the Constitution.").

> The Governor and all other civil officers shall be liable to impeachment for any misbehavior in office, but judgment in such cases shall not extend further than to removal from office and disqualification to hold any office of trust or profit under this Commonwealth. The person accused, whether convicted or acquitted, shall nevertheless be liable to indictment, trial, judgment and punishment according to law.

Pa. Const. art. VI, § 6.

By virtue of this language, the question then becomes whether the Pennsylvania Constitution gives the General Assembly the power to impeach and remove county or local officers. *See Pettit v. Namie*, 931 A.2d 790, 797 (Pa. Cmwlth. 2007) ("[I]n Pennsylvania, district attorneys are properly considered county rather than state officers."). The answer hinges upon the meaning of "all other civil officers," as that term is used in article VI, section 6. While that meaning is not immediately apparent from the text itself, District Attorney argues the most reasonable reading is that "all other civil officers" are only those individuals who hold state-level offices. Article VI, section 6 speaks of "[t]he Governor and all other civil officers" as those which are susceptible to the General Assembly's powers of impeachment and removal. Pa. Const. art. VI, § 6. Though, again, the meaning of "all other civil officers" is not plainly evident, District Attorney directs our attention to the doctrine of *ejusdem generis*. District Attorney's Br. at 17-18.

> "Under [this] doctrine . . . , where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." *McClellan v. Health Maint*[*. Org. of Pa.*], . . . 686 A.2d 801, 806 ([Pa.] 1996). Stated in somewhat repetitive yet different language, the rule of *ejusdem generis* instructs that "where general words follow an enumeration of . . . words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as

> applying only to ... the same general kind or class as those specifically mentioned." *Steele v. Statesman* [*Ins. Co.*], . . . 607 A.2d 742, 743 ([Pa.] 1992).

*S.A. by H.O. v. Pittsburgh Pub. Sch. Dist.*, 160 A.3d 940, 946 (Pa. Cmwlth. 2017). The Governor holds a state-level elected office, so, in District Attorney's reading, *ejusdem generis* requires that "all other civil officers" subject to impeachment and removal by the General Assembly must be of a similar station, *i.e.*, holding state-level elected office. District Attorney's Br. at 17-19. As District Attorney is an officer of the City of Philadelphia, under his preferred interpretation, he therefore is not of the same class of elected official as the Governor and is not subject to impeachment and trial by the General Assembly. *See* Pa. Const. art. IX, § 4 ("County officers shall consist of . . . district attorneys[.]"); *id.* art. IX, § 13(e) ("Upon adoption of this amendment all county officers shall become officers of the City of Philadelphia[.]"); *Chalfin v. Specter*, 233 A.2d 562, 565 (Pa. 1967). Furthermore, District Attorney also points our attention towards excerpts from the debates and the legislative history pertaining to the impeachment provisions from various versions of the Pennsylvania Constitution. District Attorney's Br. at 19-21. District Attorney asserts that these excerpts also support his position that the General Assembly does not have constitutional authority to impeach and try him. *Id.* This interpretation is supported by the fact that "judgment in [impeachment] cases shall not extend further than to removal from office and disqualification to hold any office of trust or profit under this Commonwealth." Pa. Const. art. VI, § 6. It would be illogical for article VI, section 6 to be read to allow the General Assembly to impeach and remove District Attorney as Philadelphia's district attorney, when the same provision does not enable the General Assembly to disqualify him from holding that office again in the future. *See Com. ex rel. Woodruff v. Joyce*, 139 A. 742, 742 (Pa. 1927) (the

26

phrase "any office under this Commonwealth" refers only to state-level offices, not local offices).

Unfortunately for District Attorney, though, his proposed reading of article VI, section 6 conflicts with the general tenor of relevant case law. Notably, there are prior Supreme Court cases that imply that article VI of the Pennsylvania Constitution, as a whole, applies to local officials as well as state-level officials. *See S. Newton Twp. Electors v. S. Newton Twp. Supervisor, Bouch*, 838 A.2d 643 (Pa. 2003); *Allegheny Inst. Taxpayers Coal. v. Allegheny Reg'l Asset Dist.*, 727 A.2d 113 (Pa. 1999); *In re Pet. to Recall Reese*, 665 A.2d 1162 (Pa. 1995). In each of those cases, a local official successfully fought removal efforts that were initiated at the local level by arguing that article VI, Section 7 was the only legal mechanism by which they could be removed from office, or the issue of how a local official could be removed was addressed as part of the Supreme Court's reasoning. Additionally, the Supreme Court has expressly stated that a theory of a similar nature, whereby local officials are not subject to the removal process outlined in article VI, section 7, which addresses the removal of "all civil officers . . . on conviction of misbehavior in office or of any infamous crime[,]" as well as the Governor's ability to remove certain kinds of civil officers for cause,

> is in at least facial tension with prior decisions of this Court. *See, e.g.*, *Com*[.] *ex rel. Schofield v. Lindsay*, . . . 198 A. 635 ([Pa.] 1938) (quoting *In re Georges Twp. Sch. Dirs.*, . . . 133 A. 223, 225 ([Pa.] 1926)[,] for the proposition that, "in so far as appointive officers are concerned, there is the right, under . . . article [VI], section 4, of the Constitution, on the part of the one selecting, to remove at his own pleasure . . . and this applies not only to officers designated by the Governor, but to those permitted by the Legislature to make the appointment in question, whether the employment be by the state, a county, or municipality"); *accord Finley v. McNair*, . . . 176 A. 10,

27

> 11 & n. 1 ([Pa.] 1935) (including an assistant county superintendent of schools as one among those "held to be officers" in prior cases).

*Burger v. Sch. Bd. of McGuffey Sch. Dist.*, 923 A.2d 1155, 1162 n.6 (Pa. 2007).[14]

Furthermore, with regard to a previous version of the Pennsylvania Constitution's removal provision, which is substantially similar to the one contained in the current version of article VI, section 7, the Supreme Court stated:

> Under the . . . constitution there are three kinds of removal, to wit, on conviction of misbehavior or crime, at the pleasure of the appointing power, and for reasonable cause on the address of two-thirds of the senate. All officers are subject to the first kind, appointed officers to the second, and elected officers to the third. It seems to us very clear that the word "officers" here is used in the same sense throughout the section so far as their classification into state, county and municipal, is concerned. We cannot conceive that we have any right to say that the expression "appointed officers" shall be held to exclude such as are municipal, and include only such as are state or county, when it is not at all disputed that the expression "all officers" in the first clause includes them all. The distinction between appointed and elected officers, is one that relates merely to the source of their authority. That is, those that are appointed, not some of them but all of them, may be removed at the mere pleasure of the power that appointed them, and those that are elected, on the address of two-thirds of the senate, and by the governor. . . . It seems to us that we would be making, rather than construing, the constitution if we should say that appointed municipal officers shall not be removable at the pleasure of the power which appointed them, when the plain unambiguous words of the instrument positively declare

---

[14] Interestingly, former Justice Saylor wrote a concurrence in *Burger*, in which he cast doubt upon the viability of the preexisting line of case law, because "it is not clear that those decisions took into account the Commonwealth-official versus local-official distinction." 923 A.2d at 1167 (Saylor, J., concurring). The majority described former Justice Saylor's reading of article VI as "novel" and "cogent," but declined to join him, both because "it [was] not one raised by the parties" and because of the aforementioned "tension" between former Justice Saylor's analysis and extant case law. *Id.* at 1161 n.6.

28

that all appointed officers shall be subject to such removal. If we could thus declare, it is difficult to perceive any good reason why we might not with the same propriety hold that appointed county officers should be exempted from this method of removal. In truth there is no distinction appearing in the section either by words or inference, in either the territorial or functional character of the offices held by the persons who are subjected to its operation. For us to make such a distinction would be a work of creation, not of interpretation.

*Houseman v. Com. ex rel. Tener*, 100 Pa. 222, 230-31 (1882). Even more injurious to District Attorney's claim that he is not a civil officer in terms of article VI, section 6 is *Commonwealth ex rel. Specter v. Martin*, 232 A.2d 729 (Pa. 1967), in which the Supreme Court dealt with whether Arlen Specter's candidacy for Mayor of Philadelphia prevented him from retaining his position as the City's District Attorney. In that splintered decision, there was a 5-1 majority, sprinkled across three separate opinions, in favor of concluding that the district attorney of Philadelphia is subject to the Pennsylvania Constitution's removal provisions,[15] due to the usage in article VI, section 7 of the phrase "[a]ll civil officers[.]"[16] *See Martin*, 232 A.2d at

---

[15] *Martin* predates the current Pennsylvania Constitution, which went into effect in 1968, but the wording of article VI, section 7 is the same in both the current and pre-1968 versions of the Pennsylvania Constitution.

[16] The *Martin* Court was evenly split regarding whether Specter was a state official or a local official, but this disagreement was resolved in *Chalfin*, in which four justices agreed that Specter, as Philadelphia's district attorney, was a local official. 233 A.2d at 565 (Bell, C.J., concurring) ("Justices JONES, O'BRIEN and ROBERTS remain of the opinion that the district attorney of Philadelphia is a State officer and is not subject to the City Charter, or compelled to resign in order to be a candidate for Mayor. However, the majority of this 7-Judge Court agree with me on this point and are convinced that under the Constitution of Pennsylvania and the Philadelphia Home Rule Charter, the district attorney of Philadelphia is a City officer and is subject to the Home Rule Charter."). However, unlike in *Martin*, the *Chalfin* Court did not address whether the Pennsylvania Constitution's removal process could be used against the district attorney of Philadelphia. As such, the portion of *Martin* that answered that question in the affirmative is still good law.

733-39 (plurality opinion); *id.* at 743-44 (Eagen, J., concurring in part); *id.* at 753-55 (Musmanno, J., separate opinion). There is thus no principled basis for us to conclude that the nearly identical language in article VI, section 6 should be treated differently. As a result, we hold that the General Assembly *does* have such power to impeach and try local officials under article VI, section 6.

Nor does the second part of District Attorney's argument warrant a change in this conclusion, as it is entirely contingent upon the first part of his argument regarding Count II. article XI, section 13 of the Pennsylvania Constitution, in relevant part, abolished all county offices in Philadelphia, replaced them with City offices, and directed that the City officers elected or appointed to those offices be subject to the Constitution and the laws in place at the time of the amendment's effective date, unless the General Assembly provided otherwise. *See* Pa. Const. art. IX, § 13(a), (f). Among the laws in place in 1951, the time at which article IX, section 13 took effect, was the Act of June 25, 1919, P.L. 581, No. 274, more commonly known as the Charter Act, City Charter Act, or First Class City Charter Act. *See In re Hadley*, 6 A.2d 874, 876 (Pa. 1939); *Stewart v. Hadley*, 193 A. 41, 42 (Pa. 1937); *Leary v. City of Phila.*, 172 A. 459, 460 (Pa. 1934). Section 9 of the Charter Act authorizes the impeachment and removal of a City officer through a process that starts with a complaint filed with the Court of Common Pleas of Philadelphia County by 20 "qualified electors," followed by an initial examination by the Court of the allegations therein, a rule to show cause hearing, the appointment by the Court of an investigative committee consisting "of [5] competent and reputable citizens," the issuance of a report by the committee, a trial presided over by the Court's president judge, and, finally, the removal of the municipal officer from his post. 53 P.S. §§ 12199-12205.

30

As District Attorney is a "civil officer" for purposes of article VI, section 6 of the Pennsylvania Constitution, Section 9 of the Charter Act at most *complements*, but does not *supplant*, the General Assembly's power to impeach him. Given this, as well as our disposition of the first part of District Attorney's argument, the contingent second part cannot entitle him to the relief he seeks through Count II. Accordingly, we deny District Attorney's Application for Summary Relief, and grant Interim President's Cross-Application, regarding Count II.

3. What Constitutes "Any Misbehavior in Office" in the Context of article VI, section 6 of the Pennsylvania Constitution and Do the Amended Articles Contain Viable Allegations that District Attorney Committed Such Conduct?

Finally, in Count III, District Attorney argues that the Amended Articles fail to allege conduct on his part that would satisfy article VI, section 6's[17] requirement that he may be impeached and tried only in the event he committed "any misbehavior in office." We agree.

There do not appear to have been any prior cases that have interpreted what this phrase means in the context of impeachment, but guidance can be found from *In re Braig*, 590 A.2d 284 (Pa. 1991), where the Supreme Court addressed former

---

[17] As noted *supra*, article VI, section 6 reads as follows:

> The Governor and all other civil officers shall be liable to impeachment for any misbehavior in office, but judgment in such cases shall not extend further than to removal from office and disqualification to hold any office of trust or profit under this Commonwealth. The person accused, whether convicted or acquitted, shall nevertheless be liable to indictment, trial, judgment and punishment according to law.

31

article V, section 18(l) of the Pennsylvania Constitution,[18] which mandated the removal and barring from office of any jurist who has been convicted in a court of law "of misbehavior in office," as well as article VI, section 7's similar language regarding civil officers.[19] As explained by the *Braig* Court:

> "Misbehavior in office" was a common law crime consisting of the failure to perform a positive ministerial duty of the office or the performance of a discretionary duty with an improper or corrupt motive. Our Constitution has long contained provisions specifying that civil officers "shall be removed on conviction of misbehavior in office or of any infamous crime." Constitution of 1838, [a]rticle VI, [s]ection 9; Constitution of 1874, [a]rticle VI, [s]ection 4 (renumbered [a]rticle VI, [s]ection 7 on May 17, 1966). In the several cases where interpretation of these provisions came before the appellate courts, it was uniformly understood that the reference to "misbehavior in office" was to the criminal offense as defined at common law.
>
> . . . .

---

[18] Former article V, section 18(l) read as follows: "A justice, judge or justice of the peace convicted of misbehavior in office by a court, disbarred as a member of the bar of the Supreme Court or removed under this section eighteen [of the Pennsylvania Constitution] shall forfeit automatically his judicial office and thereafter be ineligible for judicial office." *Formerly* Pa. Const. art. V, § 18(l).

[19] Article VI, section 7 reads as follows:

> All civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. Appointed civil officers, other than judges of the courts of record, may be removed at the pleasure of the power by which they shall have been appointed. All civil officers elected by the people, except the Governor, the Lieutenant Governor, members of the General Assembly and judges of the courts of record, shall be removed by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate.

Based on our reading of all the cases, we must conclude that the language of [a]rticle V, [s]ection 18(l), like the identical language of present [a]rticle VI, [s]ection 7, refers to the offense of "misbehavior in office" as it was defined at common law. This conclusion is not without its difficulties, however. Since the enactment of the Crimes Code effective June 6, 1973,[20] common law crimes have been abolished and "[n]o conduct constitutes a crime unless it is a crime under this title or another statute of this Commonwealth." 18 Pa. C.S. § 107(b). Thus no prosecution on a charge of "misbehavior in office" can now be undertaken. Rather than reach the difficult question whether the legislature could effectively nullify the constitutional provision by abolishing the crime referred to therein, we think it prudent to adopt a holding under which the constitutional provision may still be given effect. Therefore, we hold that the automatic forfeiture provision of [a]rticle V, [s]ection 18(l) applies where a judge has been convicted of a crime that satisfies the elements of the common law offense of misbehavior in office.

*Braig*, 590 A.2d at 286-88.[21]

District Attorney and Interim President take opposing positions regarding *Braig*. District Attorney maintains that the understanding of "misbehavior in office" that was articulated in *Braig* is equally applicable here, despite the fact that *Braig* did not deal with how to interpret article VI, section 6. In District Attorney's view, "misbehavior in office" has a uniform meaning wherever it is used in the Pennsylvania Constitution, and allows for impeachment, trial, and removal only where a public official failed to perform a positive ministerial duty or performed a

---

[20] 18 Pa.C.S. §§ 101-9546.

[21] Article V, section 18 of the Pennsylvania Constitution was repealed and replaced in its entirety in 1993. The amended provision contains virtually identical language in article V, section 18(d)(3) ("A justice, judge or justice of the peace convicted of misbehavior in office by a court, disbarred as a member of the bar of the Supreme Court or removed under this section shall forfeit automatically his judicial office and thereafter be ineligible for judicial office.").

discretionary duty with an improper or corrupt motive. By contrast, Interim President argues that *Braig* is inapposite. She asserts that article VI, section 6's allowance for impeachment "for any misbehavior in office" distinguishes it from article VI, section 7's declaration that civil officers are subject to removal "on conviction of misbehavior in office" and former article V, section 18(l)'s language that a jurist will automatically forfeit their office and be barred therefrom upon being "convicted of misbehavior in office by a court." Interim President believes that "any misbehavior in office," in terms of the impeachment process, is whatever the General Assembly deems it to be; in other words, it is a political offense, not a criminal one. According to Interim President, her interpretation is supported by *Larsen*, in which our Court declined to hold that a public official may only be impeached for what amount to criminal offenses. In addition, Interim President claims her reasoning is supported by the alterations that were made to article VI when it was amended in 1966 to, in relevant part, change its wording from allowing impeachment "for any misdemeanor in office" to allowing impeachment "for any misbehavior in office."

With regard to Interim President's assertion about *Larsen*, the salient portion of that opinion reads as follows:

> [Larsen] seems to pursue an alternative argument that the impeachment charges by the House . . . do not amount to a constitutionally valid basis for impeachment because they do not, at least in some respects, amount to charges of criminal offenses.

> [Larsen] refers to the Preparatory Committee Report on the Judiciary, for the Pennsylvania Constitution Convention, 1967-1968, pp. 158-160 to support the point that "misbehavior in office"—the [section] 6 statement of impeachable offense—should be interpreted as referring only to the common law crime of misconduct in office, quoting the cited portion of the report as follows:

34

The common law of misconduct in office, variously called misbehavior, misfeasance, or misdemeanor in office, means either the breach of a positive statutory duty or the performance by a public official of a discretionary act with an improper or corrupt motive. . . . The multiple usage of the term "misbehavior in office" appears to be a codification of the common law offense.

However, it is impossible to perceive how the impeachment charges in this case depart from even that strict definition of impeachable offense, which finds no support in judicial precedents. Briefly summarized, the charges are as follows:

1. [Larsen] tracked petitions for allowance of appeal to the Supreme Court, for special handling, because friends and political contributors were involved as attorneys;

2. [Larsen] engaged in *ex parte* communications and exchanges with a friend and political supporter who was the attorney in two cases in which petitions for allowance of appeal were pending before the Supreme Court;

3. [Larsen] made false statements to the grand jury;

4. [Larsen] communicated *ex parte* with a trial judge to influence the outcome of a trial court proceeding;

5. In litigation pursuant to his reprimand by the Supreme Court, petitioner made false statements under oath;

6. [Larsen] violated prescription drug laws.

Even if the definition of "misbehavior in office" for impeachment purposes, quoted above from the writings of the Constitutional Convention Preparatory Committee, had the force of law, review of the impeachment charges leads to the conclusion that they involve breaches of "positive statutory duty" and also "performance of discretionary act with improper or corrupt motive."

35

646 A.2d at 702. In short, *Larsen* provides muddled support at best for Interim President's position. The Court expressed some skepticism towards the idea that "any misbehavior in office" only refers to criminal offenses, but did not actually hold that Larsen's preferred, narrower definition was incorrect and, instead, went on to address and apply that definition to the merits of Larsen's claims.

As for Interim President's position regarding the 1966 amendment of article VI of the Pennsylvania Constitution, it is true that the pre-1966 amendment language was narrow in scope. As explained by the Supreme Court:

> The [pre-1966 amended] [C]onstitution provides in [a]rticle 6, section 1, . . . that "'[t]he House of Representatives shall have the sole power of impeachment.'" This plain language makes the power plenary within constitutional limits, that is to say, "'for any misdemeanor in office,'" which is a criminal act in the course of the conduct of the office, to which impeachments are limited. For crimes not misdemeanors in office, impeachment cannot be brought. This is the clear wording of section 3 of [a]rticle 6, . . . which reads, "'The Governor and all other civil officers shall be liable to impeachment for any misdemeanor in office.'"

*Dauph. Cnty. Grand Jury*, 2 A.2d at 803. However, it does not follow from this that changing the wording from "misdemeanor" to "misbehavior" necessarily broadened the scope of activities for which a public official may be impeached from only criminal acts committed in office to anything the General Assembly deemed objectionable. Indeed, the framers of the 1966 amendment, as well as the voters who approved it, would undoubtedly have been aware of the general understanding of "misbehavior in office" and the fact that it was at that point a common law crime in Pennsylvania,[22] as well as its usage and understanding throughout other parts of the

---

[22] As noted in *Braig*, common law crimes, of which misbehavior in office was one, were not abolished until the Crimes Code was enacted in June 1973.

36

Pennsylvania Constitution. It would be illogical to conclude, without firm supporting evidence that is not on offer here, that a phrase has entirely different meanings when deployed in such a way. Rather, it is more plausible that the 1966 amendment simply harmonized the wording of article VI's impeachment provision with other, similar provisions elsewhere in the Pennsylvania Constitution.

It follows, then, that it is much more reasonable for us to conclude that the 1966 amendment of article VI of the Pennsylvania Constitution *shrank* the universe of potentially impeachable offenses. In this reading, pre-1966 amendment article VI allowed for impeachment in the event a public official committed "a criminal act in the course of the conduct of the office[.]" *Id.* Post-amendment, however, it only permits impeachment in the event a public official has acted in a manner that conformed with the generally understood, preexisting definition of the crime of "misbehavior in office," *i.e.*, the failure to perform a positive ministerial duty or the performance of a discretionary duty with an improper or corrupt motive.[23] Such a reading comports with our canons of constitutional interpretation far more comfortably than that proposed by Interim President. *See Bruno*, 101 A.3d at 659.

What distinguishes the impeachment provisions of article VI, section 6 from the removal provisions contained in article VI, section 7 and article V, section 18(d)(3) is that impeachable misbehavior in office does not require a preexisting

---

[23] This would, for example, have had the effect of adding an intent requirement to the General Assembly's equation when determining whether a public official could be impeached, tried, and removed for the unlawful performance of a discretionary duty. *See Com. v. Hubbs*, 8 A.2d 618, 620 (Pa. Super. 1939) ("Misbehaviour in office may arise from failure to perform a statutory duty, or from failure to perform a common law duty. In either case the indictment must charge more than negligence. . . . [T]he wil[l]ful failure to perform a ministerial duty comes within the common law definition of misdemeanor in public office, and it is not necessary to aver or prove that the officer acted with a corrupt, fraudulent or dishonest intent. But where the nature of the duty is such as to permit the exercise of discretion, there must be present the additional element of an evil or corrupt design to warrant conviction.").

criminal conviction in a court of law. In this context, and in light of the "judicial" nature of impeachment proceedings, it is logical then to treat the Amended Articles as, in essence, an indictment of District Attorney by the House, with the Senate acting in the dual roles of judge and jury, both presiding over District Attorney's trial and voting on the charges after the presentation of evidence. Ultimately, however, the Amended Articles, and indeed the whole process itself, are constitutionally sound only in the event that the substance of the House's "charges" are akin to a criminal indictment of District Attorney for misbehavior in office. Each of the Amended Articles must therefore be scrutinized, in order to determine whether they satisfy this standard. In other words, each of the Amended Articles meets constitutional muster only if the assertions made there would support a conclusion that District Attorney failed to perform a positive ministerial duty or performed a discretionary duty with an improper or corrupt motive.

In Article I of the Amended Articles, the House alleges that District Attorney has been derelict in his duties and has violated the law. Specifically, the House avers that District Attorney has fired experienced line prosecutors and hired ones without the necessary level of expertise; withdrew his office from the Pennsylvania District Attorneys Association due to policy disagreements; altered prosecutorial training "to focus on issues that promote . . . [District Attorney's] radically progressive philosophies rather than how to effectively prosecute a criminal case"; reoriented office charging and plea bargaining policies regarding certain prostitution, drug possession, and other low-level crimes to focus on limiting pre-trial detainment and increasing the use of alternative sentencing practices instead of post-conviction incarceration; began factoring defendants' immigration status into the plea bargaining process; and set goals to limit the length of carceral sentences, as well as

38

of both parole and probation supervision. *See* PFR, Ex. C at 26-29. The House claims that these decisions have led to decreased prosecution of crimes and guilty verdicts, as well as a sharp increase in the crime rate in Philadelphia. *See id.* at 29-34. What the House *does not do*, however, is make assertions in Article I that would sustain a charge of misbehavior in office. Each of the House's concerns in Article I pertains to discretionary determinations made by District Attorney in his role as Philadelphia's district attorney, but are not supported by allegations that those determinations were the product of an improper or corrupt motive. Instead, the House simply appears not to approve of the way District Attorney has chosen to run his office. Regardless of whether any of the House's concerns have substantive merit, it remains that such disagreements, standing alone, are not enough to create a constitutionally sound basis for impeaching and removing District Attorney. *Cf. Com. v. Clancy*, 192 A.3d 44, 53 (Pa. 2018) ("[T]he prosecutor is afforded such great deference that this Court and the Supreme Court of the United States seldom interfere with a prosecutor's charging decision. *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 693 . . . (1974) (noting that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Com*[.] *v. Stipetich*, . . . 652 A.2d 1294, 1295 ([Pa.] 1995) (noting that "the ultimate discretion to file criminal charges lies in the district attorney")); *Com. v. Brown*, 708 A.2d 81, 84 (Pa. 1998) (quoting *Com. v. Malloy*, 450 A.2d 689, 692 (Pa. Super. 1982)) "[T]he district attorney is permitted to exercise sound discretion to refrain from proceeding in a criminal case whenever he, in good faith, thinks that the prosecution would not serve the best interests of the state."); *Com. ex rel. Specter v. Bauer*, 261 A.2d 573, 576 (Pa. 1970) (cleaned up) ("The [d]istrict [a]ttorney of Philadelphia County, no less than district attorneys in any other county of this Commonwealth, is the sole public

official charged with the legal responsibility of conducting in court all criminal and other prosecutions, in the name of the Commonwealth. . . . The [d]istrict [a]ttorney must be allowed to carry out this important function without hindrance or interference from any source."); *Com. v. DiPasquale*, 246 A.2d 430, 432 (Pa. 1968) (citation omitted) ("A [d]istrict [a]ttorney has a [g]eneral and widely recognized power to conduct criminal litigation and prosecutions on behalf of the Commonwealth, and to decide whether and when to prosecute, and whether and when to continue or discontinue a case. . . . But this broad general power of a [d]istrict [a]ttorney is subject to the right the power of a Court (a) to provide generally for the orderly administration of criminal Justice, including the right and power to supervise all trials and all Court proceedings, and (b) to protect all of a defendant's rights to a fair trial and due process under the Constitution of the United States and the Constitution of Pennsylvania."); *Martin*, 232 A.2d at 736 ("In the performance of his duties, the district attorney acts in a quasi-judicial capacity. . . . [T]he office of [d]istrict [a]ttorney is part and parcel of the judicial system and performs an important function in the administration of justice. . . . [I]n the performance of his duties, the law grants to the district attorney wide discretion in the exercise of which he acts in a judicial capacity.").

In Article II of the Amended Articles, the House alleges the District Attorney obstructed its Select Committee of Restoring Law and Order's investigation of him. Specifically, the House claims that District Attorney did so by opposing and then partially complying with the Select Committee's subpoenas, filing an action in Commonwealth Court challenging the Select Committee's actions, and requesting that he be allowed to testify before the Select Committee at a public hearing, rather than in private. *See* PFR, Ex. C at 34-38. However, working agreeably with the

40

investigative efforts of a General Assembly committee does not come within the responsibilities imposed by law upon district attorneys, *i.e.*, the duty to conduct prosecutions and enforce the law within their respective jurisdictions. In other words, complying with the Select Committee was not one of District Attorney's discretionary or ministerial duties, and his failure to do so cannot constitute misbehavior in office.

In Articles III, IV, and V of the Amended Articles, the House claims that District Attorney violated the Rules of Professional Conduct and the Code of Judicial Conduct by virtue of his and his office's handling of three different criminal cases. *See* PFR, Ex. C at 38-47. These articles, however, fail as a matter of law. Generally speaking, "[t]he legislature is precluded . . . from exercising powers entrusted to the judiciary." *Com. v. Stern*, 701 A.2d 568, 571 (Pa. 1997). This includes those entrusted by "[a]rticle V, [s]ection 10(c) [of the Pennsylvania Constitution, which] vests the exclusive power to govern the conduct of attorneys in the Supreme Court of Pennsylvania." *Id.* at 572. "In furtherance of that authority, [the Supreme] Court has enacted rules of professional conduct." *Lloyd v. Fishinger*, 605 A.2d 1193, 1196 (Pa. 1992). "[I]t necessarily follows that any encroachment upon the judicial power by the legislature[,]" including upon the Supreme Court's exclusive authority to discipline attorneys, "is offensive to the fundamental scheme of our government." *Com. v. Sutley*, 378 A.2d 780, 783 (Pa. 1977). As such, the General Assembly is without authority to adjudicate any such alleged violations of the Rules of Professional Conduct; only the Supreme Court may do so, through its Disciplinary Board and the administrative process that the Supreme Court has established through the Rules of Disciplinary Enforcement. As for District Attorney's alleged violations of the Code of Judicial Conduct, the Amended Articles assert that it applies to him

41

by virtue of Section 1401(o) of The County Code.[24] *See* PFR, Ex. C at 24. Section 1401(o)[25] reads as follows:

> A district attorney shall be subject to the Rules of Professional Conduct and the canons of ethics as applied to judges in the courts of common pleas of this Commonwealth insofar as such canons apply to salaries, full-time duties and conflicts of interest. Any complaint by a citizen of the county that a full-time district attorney may be in violation of this section shall be made to the Disciplinary Board of the Supreme Court of Pennsylvania. If any substantive basis is found, the board shall proceed forthwith in the manner prescribed by the rules of the Supreme Court and make such recommendation for disciplinary action as it deems advisable, provided, however, that if the Supreme Court deems the violation so grave as to warrant removal from office, the prothonotary of the Supreme Court shall transmit its findings to the Speaker of the House . . . for such action as the House . . . deems appropriate under [a]rticle VI of the Constitution of Pennsylvania.

16 P.S. § 1401(o). Thus, under Section 1401(o), the Disciplinary Board and the Supreme Court are responsible for addressing alleged violations by a district attorney of the Rules of Professional Conduct *and* of the Code of Judicial Conduct, whereas the General Assembly may only exercise its article VI authority in the event "the Supreme Court deems the violation so grave as to warrant removal from office[.]" *Id.* As the Supreme Court has made no such determination here, the

---

[24] Act of August 9, 1955, P.L. 323, *as amended*, 16 P.S. § 1401(o).

[25] Section 102(a) of The County Code states that "[e]xcept incidentally, as in sections 108, 201, 210, 211, 401 and 1401 or as provided in section 1770.12, [added by the Act of April 20, 2016, P.L. 136,] Article XII-B and Article XXX [of The County Code], this act does not apply to counties of the first or second classes." 16 P.S. § 102(a). Philadelphia is a county of the first class. *See Lohr v. Saratoga Partners, L.P.*, 238 A.3d 1198, 1200 (Pa. 2020). It is unclear what "incidentally" means in this context, or how exactly Section 1401, which is titled "District attorney; qualifications; eligibility; compensation[,]" "incidentally" applies to District Attorney; rather, it would appear to apply to him directly.

42

General Assembly cannot impeach or try District Attorney for allegedly violating either the Rules *or* the Code.

In Article VI of the Amended Articles, the House alleges that District Attorney and assistant district attorneys under his supervision repeatedly violated Section 201 of the Crime Victims Act, 18 P.S. § 11.201,[26] as well as 18 U.S.C. § 3771, "on multiple occasions by specifically failing to timely contact victims, deliberately misleading victims and[/]or disregarding victim input and treating victims with contempt and disrespect." PFR, Ex. C at 47-48. This would appear to facially present a claim that District Attorney failed to perform positive ministerial duties imposed upon him by law. However, the complicating factor is that the House fails to identify *any specific examples* of such behavior. Article VI, as currently constituted, therefore lacks the specificity required to sustain a charge of misbehavior in office against District Attorney. *See Hubbs*, 8 A.2d at 620-21 (indictment for misbehavior in office must be sufficiently specific in order to viably present charges against the accused of misbehavior in office).

Finally, as to Article VII of the Amended Articles, the House largely reasserts its allegations from Article I, albeit in slightly different language. PFR, Ex. C at 48-49. The House claims that District Attorney has elected to not prosecute certain types of crime, including "prostitution, theft[,] and drug-related offenses, among others[,]" in violation of the separation of powers and of the General Assembly's legislative authority. *Id.* at 49. However, Article VII runs into the same problems as Article I, in that District Attorney, as Philadelphia's chief law enforcement officer, has broad discretion regarding his policy decisions and prosecution choices. Given this, as well as the fact that the charges in Article VII do not rise to the level of alleging that

---

[26] Act of November 24, 1998, P.L. 882, *as amended*.

43

District Attorney has exercised this discretion with improper or corrupt motive, Article VII fails to support an impeachable charge of misbehavior in office against District Attorney.

Therefore, in sum, none of the Amended Articles viably allege that District Attorney has acted in a manner that constitutes "any misbehavior in office." As such, the Amended Articles do not comply with the requirements imposed by article VI, section 6 of the Pennsylvania Constitution and cannot serve as the basis for a constitutionally sound impeachment trial. Accordingly, we grant District Attorney's Application for Summary Relief, and deny Interim President's Cross-Application, regarding Count III.

### E. Proposed Intervenor's Intervention Application

Lastly, we conclude that Proposed Intervenor satisfies the requirements of Pennsylvania Rule of Civil Procedure 2327(4), as the resolution of this matter will directly affect his interests as a member of the Senate. *See Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 225 A.3d 902, 911 (Pa. Cmwlth. 2020). Therefore, we grant his Intervention Application.

### *III. Conclusion*

For the foregoing reasons, this opinion is issued in support of our December 30, 2022 order, which overruled Impeachment Managers' preliminary objections in full; granted Interim President's Cross-Application as to Counts I and II of District Attorney's PFR, and denied the Cross-Application as to Count III of the PFR and regarding Interim President's arguments pertaining to indispensable parties and ripeness; and denied District Attorney's Application for Summary Relief regarding

44

Counts I and II, and granted it regarding Count III, of his PFR; and granted Proposed Intervenor's Intervention Application.

_____
ELLEN CEISLER, Judge

Judges Covey, Fizzano Cannon, Dumas, and Wallace did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Larry Krasner, in his official capacity : 
as the District Attorney of :
Philadelphia, :
                Petitioner :
                 :
        v. : No. 563 M.D. 2022
                 :
Senator Kim Ward, in her official :
capacity as Interim President Pro :
Tempore of the Senate; :
Representative Timothy R. Bonner, :
in his official capacity as an :
impeachment manager; :
Representative Craig Williams, in :
his official capacity as an :
impeachment manager; :
Representative Jared Solomon, in :
his official capacity as an :
impeachment manager; and :
John Does, in their official capacities :
as members of the Senate :
Impeachment Committee, :
             Respondents : Argued: December 29, 2022

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge

**_OPINION NOT REPORTED_**

DISSENTING OPINION
BY JUDGE McCULLOUGH                FILED: January 12, 2023

        We cannot, at this juncture, rule on any of the claims presented in Petitioner Larry Krasner's (Krasner) Petition for Review (PFR). Although Krasner

has raised serious and far-reaching issues concerning his reputation and the breadth and scope of the Pennsylvania General Assembly's (General Assembly) impeachment powers (the import of which should not be minimized), he has failed to join in this action the Senate of Pennsylvania (Senate) and the Senate Impeachment Committee (Impeachment Committee), both of which clearly are indispensable parties. As such, I respectfully believe this Court is without subject matter jurisdiction to decide any of the claims asserted in the PFR.

Further, even assuming, *arguendo*, this Court had jurisdiction, the Majority's decision nevertheless has hurriedly and needlessly plunged this Court into a wash of nonjusticiable political questions over which we currently have no decision-making authority. In so doing, the Majority transgresses longstanding separation of powers principles.

For these reasons, I must respectfully, but avidly, dissent.

## I. Subject Matter Jurisdiction

Although my esteemed colleagues in the Majority set out the correct standard for determining whether indispensable parties have not been joined, I believe the Majority errs in applying those standards to the interests of the Senate and Impeachment Committee. The Pennsylvania Constitution expressly provides that "[a]ll impeachments shall be tried *by the Senate*." Pa. Const. art. VI, § 5 (emphasis added). The entire Senate, not its individual members, officers, or caucus leaders, is the subject of this constitutional mandate. The Majority concludes that Respondent Senator Kim Ward, the Interim President Pro Tempore of the Senate (Senator Ward),[1] adequately represents the interests of the Senate and Impeachment

---

[1] Senator Ward was sworn in as the President Pro Tempore of the Senate on January 3, 2023.

Committee (the members of which have not yet been appointed). But, I believe the Majority misconstrues and largely ignores the actual interests of those parties.

In his Prayer for Relief, Krasner requests that we declare unconstitutional and unlawful both the impeachment proceedings that have occurred to date and *any action that Respondents, the Senate, or the House of Representatives (House) might take in the future* on the Amended Articles of Impeachment (Amended Articles). *See* PFR at 30, Prayer for Relief ¶ E (emphasis added). Thus, the Senate and the Impeachment Committee have interests far more substantial and specific than the general interests involved in the case relied upon by the Majority, *City of Philadelphia v. Commonwealth*, 838 A.2d 566 (Pa. 2003), a case which involved a challenge to legislation *after it had been voted on and implemented* by the General Assembly.[2] Krasner here, by contrast, asks us to declare *in advance* that the Senate (and, by association, the Impeachment Committee) may not lawfully act on the Amended Articles. The Senate's specific, institutional interest in this regard is a far cry from the General Assembly's general interest in upholding the "procedural regularity" of its already-enacted legislation. *See City of Philadelphia*, 838 A.2d at 584. I cannot conceive of how we could afford any relief, declaratory or otherwise, against the Senate and the Impeachment Committee without their joinder.

Further, although I concur with the Majority's reasoning in dismissing the hypothetical "John Does" of the Impeachment Committee, their dismissal does

---

[2] In *City of Philadelphia*, the mayor and city filed a declaratory judgment action against the presiding officers and minority leaders of the General Assembly in this Court, challenging on constitutional grounds the procedural regularity of newly-enacted legislation. The presiding officer and minority leader respondents asserted that this Court, and, on appeal, the Supreme Court, lacked jurisdiction because not all indispensable parties had been joined. The Supreme Court concluded that exercising jurisdiction was proper because the presiding officers and minority leaders of the General Assembly could adequately represent its "general interest in defending the procedural regularity of the bills that it approves." 838 A.2d at 572.

not make the *actual* Impeachment Committee members dispensable. Rather, it only further emphasizes the point that this action is premature. Krasner named the "John Doe" Impeachment Committee members as respondents because he rightly acknowledged that the Impeachment Committee as a body has a substantial interest in this case. *See* PFR at 6 (the "[Impeachment C]ommittee and its chairperson have the powers and duties conferred *on the Senate* and the President Pro Tempore") (emphasis added). The Senate's resolutions confer on the Impeachment Committee the responsibility for receiving evidence, taking testimony, and providing a summary of that evidence and testimony to the entire Senate. *See* Senate Resolution 386, § 10; Senate Resolution 388 at 3, lines 8-14. Although the Majority seems bewildered at the notion that the Impeachment Committee "does not exist and yet is indispensable to the litigation," *see Krasner v. Ward* (Pa. Cmwlth., No. 564 M.D. 2022, filed January 9, 2023), slip. op. at 9 n.5 (Majority Opinion), respectfully, that precisely is the point.

It also is telling that, in permitting Senator Jay Costa's (Senator Costa) intervention, the Majority concludes under Pennsylvania Rule of Civil Procedure (Pa. R.Civ.P.) 2327(4) that our declarations in this case "will directly affect [Senator Costa's] interests as a member of the Senate." (Majority Opinion at 44.) I heartily agree. But Senator Costa and Senator Ward cannot by themselves answer Krasner's claims. The Senate and Impeachment Committee, as institutions, must be parties because they are among the entities against which Krasner seeks specific relief. In *Larsen v. Senate of Pennsylvania*, 646 A.2d 694 (Pa. Cmwlth. 1994), former Justice Rolf Larsen apparently recognized what the Majority here misses. Former Justice Larsen sought declaratory and injunctive relief very similar to that sought by Krasner here. But former Justice Larsen, unlike Krasner, asserted his claims against the Senate and the membership of the Senate's Impeachment Trial Committee, *i.e.*, the actual parties against whom he sought relief. *Id.* at 695.

Clearly, then, the *actual* Impeachment Committee (and not its hypothetical membership) is an indispensable party to this action. Its current nonexistence (and, therefore, absence) divests this Court of jurisdiction. For that reason, I would grant, in part, Senator Ward's Cross-Application for Summary Relief and dismiss this action in its entirety on the ground that we currently are without subject matter jurisdiction to decide it.

## II. Justiciability

Even assuming that we had subject matter jurisdiction over this case, which I contend we do not, I also would conclude that the Majority invalidly appropriates to itself decision-making authority over questions reserved in the first instance for a coordinate branch of our Commonwealth government. Again, assuming that we had jurisdiction, and although I believe that we could at this juncture decide the first two claims presented in the PFR, the same does not hold true for the question presented in the third claim, namely, whether the Amended Articles state viable grounds for impeachment. In disposing of that claim, the Majority decides, in advance, an unripe political question that at this point is constitutionally reserved for the Senate's determination.[3]

---

[3] The 206th General Assembly has adjourned and the 207th has begun. The House, the body with the constitutional authority to draft and deliver impeachment articles to the Senate for trial, determined that Krasner is a "civil officer" subject to impeachment pursuant to article VI, section 6 of the Pennsylvania Constitution. Pa. Const. art. IV, § 6. Because both of these events have occurred and concluded, we could review Krasner's first two claims without usurping the authority of the General Assembly or transgressing separation of powers principles. Thus, and again assuming our jurisdiction, I would not disagree with the Majority's disposition of those claims.

However, although I agree with the Majority that what constitutes "misbehavior in office" presents a potential constitutional question upon which we may rule, nevertheless, whether, to what extent, and in what format this Court may review the constitutionality of completed impeachment proceedings is not clear. In whatever form that review would take, it should happen
**(Footnote continued on next page…)**

Questions of justiciability are threshold matters to be resolved before addressing the merits of a dispute. *Robinson Township, Washington County, Pennsylvania v. Commonwealth*, 83 A.3d 901, 917 (Pa. 2013). In Pennsylvania, and unlike the federal approach, questions of justiciability "have no constitutional predicate, do not involve a court's jurisdiction, and are regarded instead as prudential concerns implicating courts' self-imposed limitations." *Id.* Further,

> [t]he applicable standards to determine whether a claim warrants the exercise of judicial abstention or restraint under the political question doctrine are well settled. Courts will refrain from resolving a dispute and reviewing the actions of another branch only where the determination whether the action taken is within the power granted by the Constitution has been entrusted exclusively and finally to the political branches of government for self-monitoring. To illustrate our approach to the political question doctrine, we customarily reference the several formulations by which the [United States (U.S.)] Supreme Court has described a "political question" in *Baker v. Carr*, 369 U.S. 186, 217 . . . (1962). ***Cases implicating the political question doctrine include those in which: there is a textually demonstrable constitutional commitment of the disputed issue to a coordinate political department***; there is a lack of judicially discoverable and manageable standards for resolving the disputed issue; ***the issue cannot be decided without an initial policy determination of a kind clearly for non[-]judicial discretion; a court cannot undertake independent resolution without expressing lack of the respect due coordinate branches of government***; there is an unusual need for unquestioning adherence to a political decision already made; and there is potential for embarrassment from multifarious pronouncements by various departments on one question.

---

on a developed record after the Senate, as constitutionally mandated, has had the opportunity to adjudicate the Amended Articles by trial, summary dismissal, or otherwise.

> We have made clear, however, that we will not refrain from resolving a dispute which involves only an interpretation of the laws of the Commonwealth, for the resolution of such disputes is our constitutional duty.

*Id.* at 928 (most internal citations and quotations omitted) (emphasis added).

In accord with the above, there is a "textually demonstrable constitutional commitment" to the Senate of the question of whether the Amended Articles set forth sufficient allegations of "misbehavior in office." We at least implicitly recognized that principle in *Larsen*, a case largely sidestepped by the Majority. There, former Justice Larsen brought an action in this Court seeking declaratory and injunctive relief barring the Senate from proceeding on articles of impeachment adopted by the House and scheduled for trial. *Larsen*, 646 A.2d at 695-96. The respondents, the Senate, and members of the Senate Trial Impeachment Committee, argued in part that Larsen impermissibly sought advance review of non-justiciable political questions. *Id.* at 699. We acknowledged in *Larsen* that appellate courts may review and rule upon the constitutionality of the actions of other coordinate branches of government. Proceeding more prudently than the Majority does here, however, we also observed that "where the courts have undertaken to examine legislative actions as justiciable questions, the Pennsylvania Supreme Court and this [C]ourt were *reviewing actions already theretofore taken* by the processes of the legislative body." *Larsen*, 646 A.2d at 700 (emphasis in original). Although we discussed to some degree the questions former Justice Larsen presented for review, we ultimately declined to afford any relief in advance of trial in the Senate:

> Of most significance is our conviction, from study of the ***impeachment*** provisions of the Pennsylvania Constitution, that such process ***is committed by the Constitution to the Senate of Pennsylvania to an extent which clearly bars the courts from intervening with prior restraint.*** Impeachment involves an adjudicative process,

PAM - 7

but one which has been clearly set apart by the Constitution as distinguished from adjudications by the judicial branch of government, regardless of whatever powers the courts may have to interpret actions of the legislative body, by way of review, after they have been taken. As in the case of scrutinizing the constitutionality of statutes themselves, the courts clearly have no power to intervene by injunction in advance of legislative action, any more than a court would have any power to enjoin, in advance, the enactment of a law appearing (to the courts) to be constitutionally invalid.

*Larsen*, 646 A.2d at 705 (emphasis added).

Although *Larsen* involved a direct request for pre-trial injunctive relief (a request that Krasner strategically avoids here), the applicable principle from *Larsen* remains the same: judicial restraint and respect for constitutional separation of powers. Krasner requests that this Court act in advance and tell the Senate, the House, and (at least hypothetically) the Impeachment Committee, all non-parties, that they may not lawfully take any further action in these impeachment proceedings. Krasner also candidly has admitted, as he must, that any failure of any of these parties to comply with the Majority's pronouncements would precipitate a request for injunctive relief. As discussed *supra*, however, Krasner has not named as a respondent any party with independent authority to proceed with the impeachment proceedings. It therefore is not clear against whom he would seek such injunctive relief. This, once again, highlights in boldface the jurisdictional problems with permitting this action to proceed in its current form.

Moreover, Krasner in this third claim does not ask us to review the constitutionality of legislation already enacted by the General Assembly. Nor does he request that we review and issue declarations (and, if necessary, injunctions) regarding a law's constitutionality before it is enforced by the executive branch. The courts' ability to conduct those kinds of review is firmly established. Instead,

PAM - 8

Krasner requests that we evaluate the substance of legislative action that has not yet occurred. The Majority's willingness to do so is ill-advised, particularly given that the legislative function at issue is judicial in character and has been constitutionally assigned to another branch of Commonwealth government. Whatever review we may conduct of the Senate's determination on the Amended Articles, we ought not conduct it now. In this respect, the question presented in Krasner's third claim is nonjusticiable both because it is a political question and because it is unripe. In concluding to the contrary, the Majority shirks the more prudential course of exercising judicial restraint.

Thus, and only if this Court had jurisdiction, I alternatively would concur with the Majority's disposition of Krasner's first and second claims regarding, respectively, whether the impeachment proceedings carry over from the 206th General Assembly and whether Krasner is a "civil officer" subject to impeachment under article VI, section 6 of the Pennsylvania Constitution. Unlike the Majority, however, I would sustain, in part, the Preliminary Objections of Respondent Representatives Timothy R. Bonner and Craig Williams and dismiss as nonjusticiable and unripe Krasner's third claim regarding whether the Amended Articles sufficiently allege impeachable "misbehavior in office." This, I believe, is the only disposition that properly would heed our Supreme Court's sage admonition that "[i]t is on the preservation of the lines which separate the cardinal branches of government [] that the liberties of the citizen depend." *Wilson v. School District of Philadelphia*, 195 A. 90, 93-96 (Pa. 1937).

### III.   Conclusion

Whatever may be this Court's preliminary reaction to the impeachment proceedings now underway in the General Assembly, I am convinced that we are duty-bound to decide only those legal questions that presently are within our

jurisdictional purview.  In its current form, this action presents us with none.  It accordingly should be dismissed.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Larry Krasner, in his official capacity   :
as the District Attorney of   :
Philadelphia,   :
   :
           Petitioner   :
   :
        v.   :  No. 563 M.D. 2022
   :  Argued: December 29, 2022
   :
Senator Kim Ward, in her official   :
capacity as Interim President Pro   :
Tempore of the Senate;   :
Representative Timothy R. Bonner,   :
in his official capacity as an   :
impeachment manager;   :
Representative Craig Williams, in   :
his official capacity as an   :
impeachment manager;   :
Representative Jared Solomon, in   :
his official capacity as an   :
impeachment manager; and   :
John Does, in their official capacities   :
as members of the Senate   :
Impeachment Committee,   :
   :
           Respondents   :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

CONCURRING OPINION
BY JUDGE WOJCIK                   FILED: January 12, 2023

I agree with the Majority that the Pennsylvania House of Representatives (House) is without the constitutional or statutory authority to consider or determine whether Petitioner has violated the Rules of Professional Conduct and the Code of Judicial Conduct as alleged in Impeachment Articles III, IV, and V of the Amended House Resolution No. 240, because such authority is solely and exclusively vested in the Pennsylvania Supreme Court under article V, sections 1,[1] 2(a) and (c),[2] and 10(c) of the Pennsylvania Constitution[3] and Section

---

[1] Pa. Const. art. V, §1. Article V, section 1 states:

> The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal courts in the City of Philadelphia, such other courts as may be provided by law and justices of the peace. All courts and justices of the peace and their jurisdiction shall be in this unified judicial system.

[2] Pa. Const. art. V, §2(a) and (c). Article V, section 2(a) and (c) states: "The Supreme Court (a) shall be the highest court of the Commonwealth and in this court shall be reposed the supreme judicial power of the Commonwealth; . . . and (c) shall have such jurisdiction as shall be provided by law." *See also* Section 501 of the Judicial Code, 42 Pa. C.S. §501 ("The [Supreme C]ourt shall be the highest court of this Commonwealth and in it shall be reposed the supreme judicial power of the Commonwealth."); Section 502 of the Judicial Code, 42 Pa. C.S. §502 ("The Supreme Court shall have and exercise the powers vested in it by the Constitution of Pennsylvania, including the power generally to minister justice to all persons and to exercise the powers of the [C]ourt, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722. The Supreme Court shall also have and exercise . . . [a]ll powers necessary or appropriate in aid of its original and appellate jurisdiction which are agreeable to the usages and principles of law[, and t]he powers vested in it by statute, including the provisions of this title.").

[3] Pa. Const. art. V, §10(c). Article V, section 10(c) states, in pertinent part:

> The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct . . . for admission to the bar and to practice law, . . . if such rules are consistent with this

**(Footnote continued on next page…)**

MHW-2

1401(o) of The County Code.[4]  In fact, the General Assembly specifically acknowledged the limitation to its impeachment authority in this regard in its enactment of Section 1401(o) of The County Code.  Thus, the House's actions in this respect clearly infringe upon the Supreme Court's sole and exclusive authority as a separate and coequal branch of our Commonwealth's government, and Petitioner's claims in this regard are justiciable by this Court as an unconstitutional

Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose.  All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions.

*See also* Pa. R.D.E. 103 ("The Supreme Court declares that it has inherent and exclusive power to supervise the conduct of attorneys who are its officers (which power is reasserted in [s]ection 10(c) of [a]rticle V of the Constitution of Pennsylvania) and in furtherance thereof promulgates these rules.").

[4] Act of August 9, 1955, P.L. 323, *as amended*, 16 P.S. §1401(o).  Section 1401(o) states:

A district attorney shall be subject to the Rules of Professional Conduct and the canons of ethics as applied to judges in the courts of common pleas of this Commonwealth insofar as such canons apply to salaries, full-time duties and conflicts of interest.  Any complaint by a citizen of the county that a full-time district attorney may be in violation of this section shall be made to the Disciplinary Board of the Supreme Court of Pennsylvania.  If any substantive basis is found, the board shall proceed forthwith in the manner prescribed by the rules of the Supreme Court and make such recommendation for disciplinary action as it deems advisable, provided, however, that if the Supreme Court deems the violation so grave as to warrant removal from office, the prothonotary of the Supreme Court shall transmit its findings to the Speaker of the House of Representatives for such action as the House of Representatives deems appropriate under [a]rticle VI of the Constitution of Pennsylvania.

MHW-3

exercise of the House's impeachment authority conferred by article VI, section 4 of the Pennsylvania Constitution.[5]  *See, e.g.*, *In re Investigation by Dauphin County Grand Jury, September, 1938*, 2 A.2d 802, 803 (Pa. 1938) ("Therefore, the courts have no jurisdiction in impeachment proceedings, and no control over their conduct, ***so long as actions taken are within constitutional lines***.") (emphasis added).

I joined the position of the lead opinion when the matter was presented to this Court on an expedited basis.  However, upon further reflection, I now firmly believe that the constitutional authority to issue and consider Impeachment Articles I, II, VI, and VII of the Amended House Resolution No. 240 has been solely and exclusively vested in the House pursuant to article VI, section 4, and trial on these Impeachment Articles has been solely and exclusively vested in the Pennsylvania Senate pursuant to article VI, sections 5[6] and 6[7] of the Pennsylvania Constitution.[8]

---

[5] Pa. Const. art. VI, §4.  Article VI, section 4 states:  "The House of Representatives shall have the sole power of impeachment."

[6] Pa. Const. art. VI, §5.  Article VI, section 5 states:  "All impeachments shall be tried by the Senate.  When sitting for that purpose the Senators shall be upon oath or affirmation.  No person shall be convicted without the concurrence of two-thirds of the members present."

[7] Pa. Const. art. VI, §6.  Article VI, section 6 states, in relevant part:

> [A]ll . . . civil officers shall be liable to impeachment for any misbehavior in office, but judgment in such cases shall not extend further than to removal from office and disqualification to hold any office of trust or profit under this Commonwealth.  The person accused, whether convicted or acquitted, shall nevertheless be liable to indictment, trial, judgment and punishment according to law.

[8] *See, e.g.*, *In re Cohen for Office of Philadelphia City Council-at-Large*, 225 A.3d 1083, 1090 (Pa. 2020) (Donohue, J., concurring) ("I joined the position of the Lead Opinion placing [the appellant] on the general election ballot as a candidate for Philadelphia City Council-at-Large when the matter was presented to us on an expedited basis. . . . Having reviewed Justice Wecht's thoughtful and well-reasoned Dissenting Opinion, however, I find it to be highly persuasive and,
**(Footnote continued on next page…)**

Thus, Petitioner's claims with respect to these Impeachment Articles should present nonjusticiable political questions that must ultimately be resolved by the General Assembly pursuant to its constitutional authority.[9]

Based on the foregoing, I would now sustain and overrule Respondents' preliminary objections, grant and deny Petitioner's and Respondents' cross-applications for summary relief, and grant and deny Petitioner's requested

---

in my view, should be the prevailing interpretation of Section 976(e) of the [Pennsylvania] Election Code, [Act of Act of June 3, 1937, P.L. 1333, *as amended*,] 25 P.S. §2936(e), in future cases.").

[9] As previously explained by this Court:

> Of most significance is our conviction, from study of the impeachment provisions of the Pennsylvania Constitution, that such process is committed by the Constitution to the Senate of Pennsylvania to an extent which clearly bars the courts from intervening with prior restraint. Impeachment involves an adjudicative process, but one which has been clearly set apart by the Constitution as distinguished from adjudications by the judicial branch of government, regardless of whatever powers the courts may have to interpret actions of the legislative body, by way of review, after they have been taken. As in the case of scrutinizing the constitutionality of statutes themselves, the courts clearly have no power to intervene by injunction in advance of legislative action, any more than a court would have any power to enjoin, in advance, the enactment of a law appearing (to the courts) to be constitutionally invalid.

*Larsen v. Senate of Pennsylvania*, 646 A.2d 694, 705 (Pa. Cmwlth. 1994).

That being said, while the House has the constitutional authority to impeach Petitioner in this regard, and the Pennsylvania Senate has the constitutional authority to adjudicate those Articles of Impeachment, the question of whether the House and Senate *should* proceed down that path is not within our purview. Ultimately, it is for the electors of the Commonwealth to decide if this folly has been a wise use of legislative resources, just as it is for the electors of Philadelphia to decide if Petitioner is properly discharging his duties as District Attorney.

MHW-5

declaratory relief accordingly.  I continue to be in complete agreement with the Majority's disposition of all remaining claims and issues in this matter.


_____
MICHAEL H. WOJCIK, Judge